IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )
                                )
        v.                      )  CR 06-418
                                )
DEWAYNE CREWS,                  )
                                )
        Defendant.              )

MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is a motion to suppress physical evidence (Doc. No. 73), and a motion to suppress statements (Doc. No. 85) filed by defendant, Dewayne Crews ("Crews"). The court held evidentiary hearings concerning these suppression motions on September 16, 2008 and September 17, 2008. After consideration of the evidence submitted at the hearings, the proposed findings and arguments of counsel, the court will deny defendant's motion to suppress physical evidence, and grant, in part, defendant's motion to suppress statements.

On this 20th day of February 2009, the court makes the following findings of fact and conclusions of law with respect to defendant's motions to suppress:

**I.            Findings of Fact**

1. On July 6, 2006 - in a state criminal case - Crews was sentenced to one to twelve months by the Washington County Court of Common Pleas. The first thirty days were to be served in jail with work release, and the rest on probation. (Suppression Hr'g Tr. 43 (Sept. 17, 2008) ("Hr'g Tr. II").)

2. At the time of his sentencing, Crews gave his address as 952 Second Street, Monessen, PA. (Id. 71-72.) A July 13, 2006 entry in computer records kept by the probation office

reflected a change in defendant's residence from 915 Second Street, Monessen, PA, to 456 Third Street, Donora, PA. (Suppression Hr'g Tr. 15 (Sept. 16, 2008) ("Hr'g Tr. I"); Gov. Ex. 2.) Defendant denied that he had changed his residence to 456 Third Street, but admitted that he had lived at that address with his girlfriend. (Hr'g Tr. II 71.)

3. On July 27, 2006, Crews reported to probation and met with Washington County Probation Officer Joseph Brownlee ("Brownlee"). (Hr'g Tr. I 18:11.)

4. At the July 27, 2006 meeting, Brownlee reviewed with Crews the conditions of supervision, including, inter alia, Condition No. 1, which provides: "Report to your probation officer as directed, and permit a [probation officer] to visit you at your residence, and submit to warrantless searches of your residence, vehicle, property and/or person including any drug and alcohol testing." (Id. 25:10-25.)

5. Brownlee assigned Anthony Mori ("Mori") of the Washington County Adult Probation Office to supervise Crews (Id. 15.)

6. After securing employment at Pirrini TV in Belle Vernon, Crews reported for his sentence on July 28, 2006. (Hr'g Tr. II 44.) Crews continued his employment during his incarceration, and earned approximately $260 each week in cash. (Id. 44-45.)

7. On August 26, 2006, Crews was released from jail. (Id. 45.)

8. Crews reported to probation as required on August 31, 2006 accompanied by the three-year-old son of his girlfriend. (Id. 49.) Crews met with Mori at the Donora Police Department where probation and parole had an office. (Hr'g Tr. I 32.)

9. Mori testified that during meetings with his wards, he typically would question his wards about contact with law enforcement, their living arrangements, whether they were employed or whether their employment had changed. (Id.) Mori testified that Crews resided at 456 Third Street, Donora, Pennsylvania with his girlfriend, Jody Hill ("Hill"),

2

based on his communications with Crews at the August 31, 2006 meeting. (Id. 31.) Mori also administered drug tests during these appointments. (Id. 33.)

10. At the August 31, 2006 meeting, Crews was given an instant drug test, and he tested positive for THC (marijuana), cocaine and opiates. (Id. 33-34.) After Mori told Crews about the positive drug test, Crews admitted that he had smoked marijuana, and that he had been in contact with cocaine. Crews denied using cocaine and explained that the opiates may have been from his use of pain medication. (Id. 35.)

11. At that point Mori physically searched Crews for contraband by patting him down. (Id.) Mori found two cell phones and $407.00 in cash during his search of Crews. (Id. 35; Hr'g Tr. II 51.) Mori attached significance to the presence of the cash and cell phones. Mori testified that, based upon his experience, the presence of "more than one cell phone is something indicative of the drug trade." (Hr'g Tr. I 39.) Mori was also concerned about the presence of the $407.00. Given Crews' employment situation, Mori testified that the presence of that amount of unsubstantiated cash could be indicative of criminal activity. (Id.)

12. Mori placed Crews in handcuffs and told him that he intended to search the residence located at 456 Third Street. (Hr'g Tr. I 38.) Crews told Mori that nobody was home and requested several times to call Hill, to tell her where he was, and to arrange transportation for her son. (Id.; Hr'g Tr. II 49.) Mori testified that Crews was anxious and repeatedly requested to call Hill at least half a dozen times. (Hr'g Tr. I 38, 85.) Mori testified that Crews' requests were cause for concern because he had been confronted with situations in the past where a probationer tried to contact a third party in an attempt to destroy contraband or evidence of additional violations prior to a search of the probationer's residence (Id. 86).

13. Crews was placed in a holding cell at the Donora Police Station, for about 10 minutes, and Mori decided to search Crews' residence for additional evidence of violations. (Hr'g Tr. II 51; Hr'g Tr. I 36, 76.)

14. Mori acknowledged that Crews was not free to leave at the point he was handcuffed. (Hr'g Tr. I 59.)

15. When asked, "Is that why you arrested Mr. Crews following the positive urine analysis test, or did you arrest him?" Mori responded, "He was placed in custody at that point." (Id. 85.)

16. Crews was transported handcuffed in a police vehicle to 456 Third Street. Officer Massafra ("Massafra"), a police officer with the Borough of Donora, and Police Superintendent James Brice ("Brice") transported Crews while Mori drove his own vehicle. (Id. 36, 40; Hr'g Tr. II 24.)

17. Brice was in uniform and carrying a weapon. (Hr'g Tr. I 76; Hr'g Tr. II at 8.) Massafra was not in uniform, but was armed with a visible firearm. (Hr'g Tr. I 9; Hr'g Tr. II 27.) Mori did not have a weapon. (Hr'g Tr. I 76-77.)

18. During the search of 456 Third Street, Crews remained handcuffed and confined to the living room supervised by Brice. At no time during the search was Crews permitted to leave or wander about the residence, and Miranda warnings were never given to Crews. (Hr'g Tr. I 80; Hr'g Tr. II 10, 14.)

19. Mori began the search of the residence in the upstairs bedroom accompanied by Masafra and Hill. (Hr'g Tr. I 41). Mori testified that this was the bedroom that Crews shared with Hill. (Id. 41, 80.)

20. When asked, "How did you know he had slept in that bedroom?" he answered, "There was something – there were men's and women's clothes hanging in the closet. Um, to my knowledge, based on my discussions with him during the appointment, it was only, he, Jody, and her children that stayed there. I don't know if the children stayed there all the time, or if all of her children stayed there, but I know this was a home he had shared with her." (Id. 91.)

21. Mori found a bulletproof vest, a bag of crack cocaine and a digital scale in the closet of the upstairs bedroom. (Id. 41-42.)

22. Masafra, Mori and Hill left the bedroom and returned to the first floor living room where Brice and Crews were located. (Id.) Mori had the bag of crack in his hands (Id. 101).

23. Crews was asked if there was more contraband in the house, to which he replied that there were bullets in the basement. (Hr'g Tr. II 57.)

24. Masafra and Brice then began to discuss "what the next step would be." (Id.) At this point, Crews "stated there was no need for a search warrant, that there was nothing else in the house," and "that he would consent to a search of the house." (Hr'g Tr. I 103; Hr'g Tr. II 31.) Masafra contacted another Donora police officer and had him bring a consent to search form to the residence. (Hr'g Tr. I 104-05.)

25. Crews alleges that during this period, Magistrate Hopkins from Charleroi, Pennsylvania was outside the residence in his car, and officers informed Crews that he should either sign the consent form or the magistrate would sign a search warrant. (Hr'g Tr. II 55.)

26. Crews signed the consent form for a search of the residence. (Hr'g Tr. I 104.)

27. During this phase of the search, the officers found baggies, a gun, a rifle, ammunition, a cell phone and cash. (Hr'g Tr. II 34.)

28. Massafra also found indicia of Crew's residence in the home, including an electric bill and a letter. (Hr'g Tr. II 35.)

29. Detective Silbaugh advised Crew and Hill that both would be charged with criminal offenses and asked Crews and Hill, "whose drugs are they?" (Hr'g Tr. II 20.)

30. Hill became upset started crying, talking about her kids, and rolling on the floor and asked Crews, "Why are you doing this to me?" Crews claimed that the crack was his. (Hr'g Tr. II 21.)

31. Crews was transported back to the police station and detained on his probation violation.

## II. Conclusions of Law

### A. *Motion to suppress physical evidence*

1. As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, the burden shifts to the government. Id.

2. The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. CONST. amend. IV.

3. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." United States v. Knights, 534 U.S. 112, 118-19 (2001).

4. Generally a warrant must be obtained upon a showing of probable cause before a residence or suspect is searched. United States v. Baker, 221 F.3d 438, 443 (3d Cir. 2000). When a probationer is involved and has signed a consent agreement, however, the probationer's reasonable expectation of privacy is decreased and the government's reasonable need to monitor behavior is increased. Id. "As a result, 'no more than reasonable suspicion' is required to justify a search in these circumstances." United States v. Williams, 417 F.3d 373, 376-77 (3d Cir. 2005) (citing Knights, 534 U.S. at 121).

5. The United States Court of Appeals for the Third Circuit has held that a probation officer may conduct a warrantless search of a probationer's property based upon reasonable suspicion that the probationer has violated a condition of probation even in the absence of a statutory scheme[1]. United States v. Baker, 221 F.3d 438, 443-45 (3d Cir. 2000). The court of appeals has also concluded that a warrantless search is proper even after the probationer is in custody. United States v. Hill, 967 F.2d 902, 910-11 (3d Cir 1992).

---

1. Much of Crews' argument centers on the probation officer not following the Pennsylvania statutory guidelines in conducting the searches in question. For example, absent exigent circumstances, the probation officer is required to obtain prior approval of his supervisor before conducting a warrantless search of a residence. 61 PA. CONS. STAT. ANN. § 331.27b(d)(3). Crews argues that exigent circumstances did not exist and Mori did not obtain the approval of his supervisor. The government maintains that exigent circumstances existed. While the inquiry into whether Mori followed the Pennsylvania statutory scheme is relevant to the issue whether the searches in question were reasonable under the totality of the circumstances, there is no constitutional requirement that the probation officer act pursuant to a statutory scheme. United States v. Baker, 221 F.3d 438, 444 (3d Cir. 2000) (citing Hill, 967 F.2d at 909.) The court will consider all the circumstances surrounding the searches, but the relevant inquiry here is did Mori have reasonable suspicion regarding whether Crews had violated a condition of his probation.

6. The reasonable suspicion standard is "'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). The standard is less demanding because "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

7. To decide whether "reasonable suspicion" exists, the court considers the totality of the circumstances to determine whether the "officer has a particularized and objective basis for suspecting legal wrongdoing" Id. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

   **(a.) Mori had reasonable suspicion to search Crews at the Police Station.**

8. During Crews' first routine probation meeting with Mori after completing his incarceration, Crews was administered a drug test to which he tested positive for THC (marijuana), opiates, and cocaine. At the time, Crews was serving a sentence for a drug conviction, and possession of any illicit substances was prohibited under the terms of his probation. The positive drug test provided reasonable suspicion that Crews had violated the conditions of his probation. Mori, however, had additional information to support his suspicion. Crews admitted that he smoked marijuana and that he handled cocaine.[2] Both of these acts, to which Crews admitted, were violations of his probation.[3]

---

2. Crews argues that Crews statements immediately after his positive drug test should be suppressed and therefore, can not be used to support Mori's reasonable suspicion that a probation violation had occurred. The court disagrees. These statements were not made while Crews was in custody and they are admissible. See infra Conclusions of Law B ¶ 6(i) (concluding that defendant was in custody at the point he was handcuffed following the positive drug test), and id. ¶ 11 (concluding that these statements were admissible.

3. Crews argues that Mori's search of his person at this point went beyond the scope of a Terry stop and frisk, and the items confiscated from him could not be immediately recognizable as weapons or contraband. Crews' reliance on Terry v. Ohio, 392 U.S. 1 (1968) is misplaced. Terry does not limit a probation officer's search of a probationer based on reasonable suspicion that the probationer has violated the terms of his probation. Terry does require that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Id. at 19 (quoting Warden v. Hayden, 387 U.S. 294, 310 (1967)). In this case, the search was justified by the probation officer's reasonable suspicion that a probation violation had occurred. Under these

(continued...)

**(b.) Mori had reasonable suspicion to search Crews' residence.**

9. Upon Crews' testing positive for drugs and admitting using marijuana and handling cocaine, Mori had a reasonable suspicion that Crews had violated the conditions of his probation. The search of Crews provided additional support for Mori's suspicion. Crews was carrying a large amount of cash relative to his modest income at the time. Crews was also carrying two cell phones. Mori testified given his experience in supervising parolees that both of these findings can be indicative of possible illegal activity, and are consistent with dealing in illicit drugs. It was reasonable for Mori to suspect at this point that Crews had violated his probation by dealing drugs, and a search of Crews' residence would turn up evidence of these violations.

10. Mori cites as further evidence of his suspicion that Crews was anxious to call Hill and requested to call her several times after Mori told Crews that he intended to search the residence. Although this may be consistent with Mori's experience that a probationer's attempt to make phone calls in order to destroy evidence of violations, Crews explanation of the innocent nature of the request is credible. Crews was handcuffed, his possessions were taken from him, and he had Hill's three year-old son with him in the police station. It was reasonable for Crews to make numerous requests to call Hill under the circumstances. Mori, however, already had reasonable suspicion without the additional evidence of numerous requests to call Hill.

**(c.) Crews' probationary residence was located at 456 Third Street, Donora, PA.**

11. Once Mori had reasonable suspicion to search Crews' residence, Mori could search within that residence anywhere that evidence of violations could reasonably be found. United States v. Ross, 456 U.S. 798, 820-21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found."). Evidence of drug use or drug trafficking could reasonably be found anywhere in the residence to which Crews had access. There was no evidence presented that Crews did not have access to the entire residence.

---

3. (...continued)
    circumstances, the scope of the probation officer's search would include anywhere on Crews' person where Mori could reasonably expect to find contraband or evidence of a probation violation. See Id.

12. The probation office's records reflected a change, as of July 13, 2006, in defendant's residence from 915 Second Street, Monessen, Pennsylvania, to 456 Third Street, Donora, Pennsylvania. Crews did not deny that he was living at the residence at 456 Third Street when Mori told him about Mori's intention to search that residence. Mori testified that he believed Crews residence was 456 Third Street, Donora, Pennsylvania based on information given to him by Crews. Crews' girlfriend lived at the residence and Crews admitted that he lived at the residence with his girlfriend from time to time. Crews brought Hill's three-year-old son with him to his probation meeting. Men's and women's clothes were in Hill's closet, and a letter and telephone bill indicative of Crews' living at the residence were found at the residence. Given the evidence, Crews' assertion that he did not reside at 456 Third Street and was simply an overnight guest[4] is not credible.

13. Because 456 Third Street was Crews' residence, the probation officer was entitled to search the residence upon probable cause that the probationer had violated a condition of his probation. United States v. Baker, 221 F.3d 438, 443-45 (3d Cir. 2000)

**(d.) All the relevant evidence recovered from the residence at 456 Third Street, Donora, Pennsylvania is admissible.**

14. Crews argues that several items recovered in the search are inadmissible as fruits of the poisonous tree, because they were found as a result of statements made pursuant to custodial interrogations without Miranda warnings. The issue of the admissibility of Crews' statements will be resolved in the next section, but it does not need to be resolved for purposes of the physical evidence. Even if some of Crews' statements are excluded, the fruit of the poisonous tree doctrine does not apply to the physical evidence found at the residence, because the physical evidence inevitably would have been discovered absent Crews' statements. See Nix v. Williams, 467 U.S. 431, 449 (1984)( holding that otherwise tainted evidence can be admitted if it would have inevitably been discovered through legitimate means). As this court concluded infra, Mori was conducting a lawful search of Crews' residence based upon his reasonable suspicion that a probation violation had occurred. The scope of this search included anywhere in the residence where contraband or

---

4. Crews' standing to challenge the search of the residence at 456 Third Street is not at issue in this case. Crews contends that he had standing as an overnight guest of Hill, and the government contends that 456 Third Street was Crews' residence.

evidence of the probation violation could reasonably be found. This search would have inevitably led to the discovery of the physical evidence in issue.

B. *Motion to suppress statements*

Defendant argues in his motion to suppress statements that any incriminating statements should be excluded, because they were made as a result of a custodial interrogation without Miranda warnings. The government admits that no Miranda warnings were given, but argues that 1) Crews was never in custody; and 2) Crews' statements were not a result of interrogation, but were voluntarily given.

**(a.) Crews was in custody from the time he was handcuffed at the Donora Police Station**

1. Under the rule announced in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent cannot be introduced by the prosecution at trial. United States v. Brownlee, 454 F.3d 131, 146 (3d Cir. 2006).[5]

> [T]his rule comes "into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).

---

5. The Supreme Court summarized the holding in Miranda as follows:

> Our holding . . . briefly stated . . . is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

Miranda, 384 U.S. at 444.

2. "An incriminating response is 'any response – whether inculpatory or exculpatory – that the *prosecution* may seek to introduce at trial.'" Id. (quoting Innis, 446 U.S. at 301 n. 5)(emphasis in original)).

3. The United States Court of Appeals for the Third Circuit addressed what is required for a person to be "in custody" for the purposes of Miranda. In United States v. Willaman, 437 F.3d 354 (3d Cir.), cert. denied, 126 S.Ct. 2902 (2006), the court of appeals instructed that "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" Id. at 359 (quoting United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999)). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" Id. (citing Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir.1974) (quoting United States v. Hall, 421 F.2d 540, 545 (2d Cir.1969))).

4. "Thus, 'police officers are not required to administer Miranda warnings to everyone whom they question.'" Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "Miranda, of course, requires warnings only when the person the police are questioning is in custody." Id. (citing Miranda, 384 U.S. at 468).

5. In Willaman the United States Court of Appeals for the Third Circuit set forth the factors a court considers to determine if a person was in custody.

> Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display

>
> of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

Willaman, 437 F.3d at 359-60 (citing United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004); United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001); United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000)).

6. In this case, given all the surrounding circumstances and weighing the Willaman factors, the court concludes that Crews was in custody from the time he was handcuffed at the police station. Although Mori told Crews that he was not under arrest, he did not tell him that he was free to leave. The surrounding circumstances indicated that Crews was not free to leave, and the officers seriously restrained his physical movement. There are numerous undisputed facts weighing in favor of a finding that Crews was in custody after being handcuffed including:

   i.) Crews was placed in handcuffs after he tested positive for the illegal drugs, and the handcuffs were never removed except when he was in the holding cell.

   ii.) Crews was placed in a holding cell at the Donora Police Station, for about 10 minutes.

   iii.) Crews was not permitted to make phone calls to Hill to arrange transportation for Hill's son, and was denied access to his cell phones.

   iv.) Mori acknowledged that Crews was not free to leave once he was handcuffed, and acknowledged that Crews was placed in custody at that point.

   v.) Crews was transported handcuffed in a police vehicle by a police officer and the uniformed and armed police superintendent.

vi.) During the search, Crews remained handcuffed and confined to the living room and watched over by the uniformed and armed police superintendent. At no time during the search was Crews permitted to leave or wander about the residence.

7. Crews was not in custody prior to being handcuffed. Although Crews was in the police station, Crews was attending a routine meeting with his probation officer. Crews was not confined to any particular location and was free to leave at that point. There was no display of weapons or any other coercive tactics. Crews voluntarily answered Mori's questions about the positive drug test. Under those circumstances, statements made prior to Crews being handcuffed are admissible.

**(b.) Crews' statements that there were bullets in the basement and admitting that the crack was his should be excluded as involuntary statements made as a result of custodial interrogation without <u>Miranda</u> warnings.**

8. The Supreme Court has defined interrogation as "words or actions on the part of the police ...that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects that the <u>Miranda</u> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. <u>Id.</u>

9. After transporting Crews to the residence while it was being searched, officers interrogated Crews twice which elicited incriminating responses on the part of Crews. After Masafra and Mori found contraband in the bedroom, they returned to the first floor living room where Brice and Crews were located. Mori had the bag of crack in his hands, and Crews was asked if there was more contraband. Crews responded that there were bullets in the basement. An officer should know that asking a suspect whether any more contraband in the house while showing the suspect already discovered contraband is reasonably likely to elicit an incriminating response.

10. Later during the search, Brice told Hill and Crews that they would both be charged with drug possession for the crack cocaine that was found in the search. Brice than asked them "Whose drugs are they?" After a few minutes and the reactions by Hill i.e. showing she became upset, started crying, talking about her kids, rolling on the floor and asking Crews,

"Why are you doing this to me?", Crews claimed that the crack was his. Brice should know that asking, "Whose drugs are they?" is likely to elicit an incriminating response, especially when asked in the presence of Hill and Crews. The passage of time from when Brice asked the question and when Crews responded was not significant enough to convert Crews' statement into a voluntary statement especially given the reaction of Hill.

11. Crews was not given <u>Miranda</u> warnings prior to making the statements that there were bullets in the basement and that the crack cocaine found at the residence belonged to Crews. Under the totality of the circumstances present in this case, those statements must be suppressed. Crews was in custody at the time he made those statements, and the statements were the result of interrogation and were not voluntary.

12. Because Crews was not in custody until he was handcuffed by Mori, Crews' statements made before he was handcuffed, e.g. admitting smoking marijuana and handling cocaine, are admissible.

### III.     Conclusion

For the above reasons, Crews' motion to suppress physical evidence (Doc. No. 73.) is denied. Crews' motion to suppress statements (Doc. No. 85.) is granted to the extent set forth above.

    /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc:     Counsel of Record